The **REPORTERS COMMITTEE FOR FREEDOM OF the PRESS, et al., Appellants,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, et al. (Two Cases)**

Nos. 85–6020, 85–6144.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1986.

Decided April 10, 1987.

Victoria Louise Radd, with whom Kevin T. Baine, Washington, D.C., was on the brief for appellants.

John F. Daly, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., Leonard Schaitman, Dept. of Justice, Washington, D.C., were on the brief for appellees.

Douglas Letter, Washington, D.C., entered an appearance for appellees in No. 85–6020.

Before STARR and SILBERMAN, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge STARR.

SILBERMAN, Circuit Judge:

This appeal is from a summary judgment entered by the district court dismissing a suit brought by Robert Schakne, a CBS News correspondent, and The Reporters Committee for Freedom of the Press ("Reporters"), an association of journalists, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(B) (1982). Reporters and Schakne sought to compel the Department of Justice and the Federal Bureau of Investigation to produce "any records indicating any arrests, indictments, acquittals, convictions and sentences of Phillip Medico, Charles Medico, or Samuel Medico, by state, local or federal law enforcement agencies or courts."[1] But Reporters and Schakne limited their request to documents containing information that was a "matter[ ] of public record."

Schakne's original FOIA request, filed with the Department of Justice on February 3, 1978, was not so limited, and sought in addition records on William Medico, the deceased brother of the above-named individuals. When the request was denied Schakne sent letters of appeal to the Department of Justice Office of Privacy and Information Appeals, stating for the first time that "most, if not all, of the requested documents would be on the public record in the jurisdiction in which the criminal justice procedures were invoked." On June 14, 1978, Quinlan Shea, director of the office,

affirmed the denial with respect to the living individuals, citing FOIA privacy Exemptions 6 and 7(C). Shea, however, modified the initial denials by ordering the release of records relating to the deceased William Medico. Schakne thus received what was purported to be the only record the Department of Justice and the FBI had on William Medico: his "rap sheet."[2]

Reporters also filed a request with the Department of Justice on September 21, 1978, calling for the same documents sought by Schakne. The request was denied, the denial appealed, and on January 15, 1979, the Office of Privacy and Information Appeals affirmed the denial in full, citing Exemption 7(C), and Exemption 3 in conjunction with 28 U.S.C. § 534(b) (1982). On March 13, 1979, in response to an inquiry by CBS News, Attorney General Griffin Bell explained that while "criminal history contained in *other* Department of Justice files might be released if not otherwise exempt under the Freedom of Information Act," the Department of Justice was "prohibited by statute and case law from releasing ... 'rap sheets,'" and therefore rap sheets were exempt under Exemption 3. The June 14, 1978 release of the deceased William Medico's rap sheet was described as a mistake—the result of earlier confusion over the Department's position.

Attorney General Bell's letter did not fully explain the Department's policy regarding release of rap sheets. Apparently there are two circumstances under which the Department—despite lacking explicit

---

1. Information of the type Reporters and Schakne seek might be kept in twenty different offices or components of the Department of Justice. The Criminal Division, the Drug Enforcement Administration, and the Federal Bureau of Investigation are examples. The FBI alone maintains four separate records systems containing information relating to criminal investigations: the FBI Identification Division Records System; the Central Records System; the National Crime Information Center; and the Electronic Surveillance Indices.

2. Rap sheets, or "identification records," are FBI records on individuals whose fingerprints have been submitted to the FBI in connection with arrests and, in certain instances, employ-

ment, naturalization and military service. *See* 28 C.F.R. § 16.31 (1986). A rap sheet typically contains information concerning an individual's arrests, indictments, convictions and imprisonments, and a notation of the source of the information. The FBI Identification Division does not itself generate the information on rap sheets, but rather compiles information received from local, state and other federal authorities. Rap sheets are kept in the Identification Division Records System, are copied in computerized (although less complete) form in the Computerized Criminal History files of the National Crime Information Center, and are sometimes also held in the Central Records System.

statutory authorization—believes that it has discretion to release rap sheets (or the information contained on them) to private citizens. First, the Department will release rap sheets to the subject of the rap sheet, 28 C.F.R. § 16.32 (1986), because of "a determination that 28 U.S.C. [§] 534 does not prohibit the subjects of arrest and conviction records from having access to those records." Department of Justice Order No. 556–73, 38 Fed.Reg. 32,806 (1973). Second, the Department's regulations provide that rap sheets can be made available "[f]or issuance of press releases and publicity designed to effect the apprehension of wanted persons...." 28 C.F.R. § 20.-33(a)(4) (1986). This "wanted persons" exception exists, according to the Department's brief, because it is "plainly among the 'coordinated law enforcement activities ...' that § 534 was designed to facilitate." [3]

Reporters and Schakne were not satisfied with the government's response, and filed suit on December 7, 1979. On October 1, 1981, the court ordered the Department to a file a *Vaughn* index detailing the exact nature of the documents being withheld, and an affidavit explaining, *inter alia,* the extent of the search conducted on behalf of Reporters and Schakne. In response to the court's order, the FBI conducted an "expanded" search of its Central Records System, discovered an additional document that made reference to the deceased William Medico, and released the document. But the FBI refused to submit an index of the records withheld, explaining in an affidavit that public acknowledgment of the mere existence of such information requested by Reporters and Schakne might constitute a clearly unwar-

ranted invasion of the subject's personal privacy.

While the suit was pending, Phillip and Samuel Medico died, leaving only one subject of the request—Charles Medico—still living. On April 29, 1983, the chief of the FBI's Freedom of Information—Privacy Acts Section, Records Management Division sent Reporters and Schakne letters indicating that since Phillip and Samuel Medico had died, the FBI would release "any FBI records responsive to [the] FOIA request" concerning the two—in order "[t]o be consistent" with the previous release of the records of the deceased William Medico. Insofar as this decision offered release of rap sheets of deceased subjects, it was plainly inconsistent with the Department's position that the Department was prohibited from releasing rap sheets to third-party members of the general public. The Department's brief explains the action as an effort to "largely moot the present controversy." The FBI attached to the letters copies of a document from the Central Records System containing references to Phillip Medico, and revealed that in fact there were no rap sheets on Phillip or Samuel Medico. With regard to Charles Medico, the still living subject of the request, the FBI partially abandoned the Department's earlier position that the records (other than rap sheets) were exempt from release under Exemption 7(C), and stated "any financial crime information which might be contained in the FBI Central Records System could be disclosed in the public interest." No such information was released, however, because none existed. The Department of Justice Criminal Division and the Drug Enforcement Administration also wrote similar letters on the

---

**3.** The Department also releases rap sheets when directed to do so by statute. There are apparently four such statutory provisions. First, 28 U.S.C. § 534(a)(4) requires the Department to exchange rap sheets with "authorized officials of the Federal Government, the States, cities and penal and other institutions." Second, the Department of Justice's 1973 Appropriations Act provided for "the exchange of identification records with officials or [sic] federally chartered or insured banking institutions ... and, if authorized by State statute and approved by the Attorney General, to officials of State and local

governments for purposes of employment and licensing...." Act of October 25, 1972, Pub.L. No. 92–544, 86 Stat. 1115 (1972). Third, the Attorney General is authorized to "process" specified inquiries (accompanied by fingerprints) submitted by private entities in the securities industry. Securities Acts Amendments of 1975, § 14, 15 U.S.C. § 78q(f)(2) (1982). Finally, the Attorney General has similar authority with respect to inquiries by applicants for registration with the Commodities Futures Trading Commission. Futures Trading Act of 1978, § 17, 7 U.S.C. § 12a(1) (1982).

same date to Reporters and Schakne, indicating that no records at all had been found on Phillip and Samuel Medico, and that no "financial crime information" had been found on Charles Medico.

The district court then dismissed the suit. The only records the Department still refused to release (or acknowledge the existence of) were Charles Medico's rap sheet and records (other than rap sheets) containing "non-financial crime" information on Charles Medico. The court held that Charles Medico's rap sheet would be exempt from disclosure under FOIA because 28 U.S.C. § 534 was an Exemption 3 withholding statute that "specifically exempt[s]" rap sheets from disclosure by requiring they "be withheld from the general public in such a manner as to leave no discretion on the issue." Further, after reviewing an *in camera* submission by the government, the court held that any other records on Charles Medico containing "non-financial crime" information would be exempt from release under FOIA privacy Exemptions 6 and 7(C).

## I.

Normally, when we construe statutes first interpreted by executive departments or independent administrative agencies we are obliged to give deference to the department or agency interpretation. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). That is so because Congress is presumed to delegate to expert agencies, and not to the judiciary, the authority to reasonably define and apply less than precise statutory terminology, *id.* at 844, 865—unless the legislative history of a particular statute carries a specific intent. *Id.* at 842, 104 S.Ct. at 2781. FOIA, however, is an unusual statute; it applies to all government agencies, and thus no one ex-

ecutive branch entity is entrusted with its primary interpretation. Moreover, since the statute's purpose—disclosure of certain information held by the government—creates tension with the understandable reluctance of government agencies to part with that information, Congress intended that the primary interpretive responsibilities rest on the judiciary, whose institutional interests are not in conflict with that statutory purpose. *See* H.R.Rep. No. 1497, 89th Cong., 2d Sess. 30 (1966), U.S.Code Cong. & Admin.News 1966, p. 2418 (court not "restricted to sanctioning agency discretion").

Many statutes other than FOIA bear upon the government's authority to disclose information to the public. In the absence of FOIA we would, pursuant to *Chevron,* defer to an agency's reasonable interpretation of such statutes. FOIA, however, directs federal agencies to comply with "any request for records," 5 U.S.C. § 552(a)(3) (1982), and by Exemption 3 excludes from its coverage only matters that are:

> *specifically* exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3) (1982) (emphasis added).[4] Records sought to be withheld under authority of another statute thus escape the release requirements of FOIA if—and only if—that statute meets the requirements of Exemption 3, including the threshold requirement that it specifically exempt matters from disclosure. The Supreme Court has equated "specifically" with "explicitly." *Baldrige v. Shapiro,* 455 U.S. 345, 355, 102 S.Ct. 1103, 1109, 71

---

**4.** The proviso was added to Exemption 3 in 1976, by the Government in the Sunshine Act, Pub.L. No. 94–409, § 5(b), 90 Stat. 1247 (1976). It was a result of congressional dissatisfaction with the broad scope given the exemption by the Supreme Court in *FAA v. Robertson,* 422 U.S. 255, 95 S.Ct. 2140, 45 L.Ed.2d 164 (1975), which held that a statute qualified under Exemption 3

because it directed the agency to withhold a wide variety of information whenever, in the judgment of the agency, release would adversely impact someone objecting to its release. *See* H.R.Rep. No. 1441, 94th Cong., 2d Sess. 25 (1976). *See also American Jewish Congress v. Kreps,* 574 F.2d 624, 627–28 (D.C.Cir.1978).

L.Ed.2d 199 (1982). "[O]nly *explicit* nondisclosure statutes that evidence a congressional determination that certain materials ought to be kept in confidence will be sufficient to qualify under the exemption." *Irons & Sears v. Dann*, 606 F.2d 1215, 1220 (D.C.Cir.1979) (emphasis added). In other words, a statute that is claimed to qualify as an Exemption 3 withholding statute must, on its face, exempt matters from disclosure. We must find a congressional purpose to exempt matters from disclosure in the actual words of the statute (or at least in the legislative history of FOIA, *see CIA v. Sims*, 471 U.S. 159, 105 S.Ct. 1881, 1887 n. 11, 85 L.Ed.2d 173 (1985))—not in the legislative history of the claimed withholding statute, nor in an agency's interpretation of the statute.[5] Quite apparently, Congress was well aware of modes of statutory interpretation that agencies and courts use to divine congressional intent— and wished, at least for the purpose of applying Exemption 3, to confine us essentially to the traditional plain meaning rule.

▉ The government claims 28 U.S.C. § 534 qualifies as a withholding statute under Exemption 3. That statute reads in relevant part:

(a) The Attorney General shall—

(1) acquire, collect, classify, and preserve identification, criminal identification, crime and other records;

. . . .

(4) exchange such records and information with, and for the official use of, authorized officials of the Federal Government, the States, cities, and penal and other institutions.

(b) The exchange of records and information authorized by subsection (a)(4) of this section is *subject to cancellation,* if dissemination is made outside the receiving departments or related agencies.

28 U.S.C. § 534 (1982) (emphasis added).[6] As seems obvious, subsection (a) does not specifically exempt from public disclosure any matter. It only authorizes the Attorney General to collect information and exchange that information with other federal and state officials. The government's contention that subsection (b), which authorizes the Attorney General to stop exchanging information with a particular governmental entity *if that entity* discloses the information, brings the statute within Exemption 3 is unpersuasive. Subsection (b) does not speak to the Attorney General's authority to disclose or refuse to disclose to the public; only by implication does it even address the recipient agency's authority to disclose to the public.

In truth, the government's argument is based not on the statutory language, but rather on the legislative history of the statute. During debate on the House floor over the 1930 law that established the FBI's Identification Division, the sponsor of the bill explained that the criminal

---

**5.** Nonetheless, it may be proper to give deference to an agency's interpretation of what matters are covered by a statute, once the court is satisfied that the statute is in fact an Exemption 3 withholding statute, *i.e.*, that it meets both the threshold test and one prong of the proviso. *See Church of Scientology of California v. IRS*, 792 F.2d 153, 167–70 (D.C.Cir.1986) (Silberman, J., concurring), *cert. granted*, ⸺ U.S. ⸺, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987); *id.* at 162–63 n. 4.

**6.** The origins of this statute trace back to 1924, when Congress first appropriated funds to the Department of Justice for "the acquisition, collection, classification, and preservation of criminal identification records and their exchange with the officials of States, cities, and other institutions." Act of May 28, 1924, Pub.L. No. 68–153, title II, ch. 204, 43 Stat. 205, 217 (1924) (codified at 5 U.S.C. § 300 (1934)). Congress established the FBI's Identification Division six

years later, in 1930, and vested it with the "duty of acquiring, collecting, classifying, and preserving criminal identification and other crime records and the exchanging of said criminal identification records with the duly authorized officials of governmental agencies, of States, cities, and penal institutions." Act of June 11, 1930, Pub.L. No. 71–337, ch. 455, 46 Stat. 554 (1930) (codified at 5 U.S.C. § 340 (1934)). The limitation now appearing in subsection (b) was added in 1957. Act of June 11, 1957, Pub.L. No. 85–49, title II, 71 Stat. 55, 61 (1957). Sections 300 and 340 were combined in 1966 and codified at 28 U.S.C. § 534. Act of September 6, 1966, Pub.L. No. 89–554, § 4(c), 80 Stat. 378, 616 (1966). The statute took its present form in 1982, with the addition of subsections (a)(1) and (2) regarding records to aid in the identification of deceased individuals and the location of missing persons. Missing Children Act, Pub.L. No. 97–292, § 2, 96 Stat. 1259 (1982).

records would be kept by the Division "so as to be available anywhere in the United States." 72 Cong.Rec. 1989 (1930) (statement of Rep. Graham). In 1957, then FBI Director Hoover expressed concern that as the law stood the FBI might lack authority to withhold records from local officials who used them "improperly," and Congress granted him the authority by adding the language now found in subsection (b). But Hoover, who appeared to specialize in questionable disclosures of information in FBI files,[7] surely would have been astonished to hear it contended that subsection (b) was directed at restricting the *FBI's* direct authority or power to disclose information to the public.[8] In any event, as we have explained, legislative history will not avail if the language of the statute itself does not explicitly deal with public disclosure.

For similar reasons, we must reject the government's argument that the congressional response to a district court opinion of this circuit demonstrates that section 534 is an Exemption 3 statute. In *Menard v. Mitchell*, an individual who had been arrested without probable cause by local authorities in California sought to prevent the FBI from disseminating information in its criminal identification files that had been forwarded to it regarding that arrest. The district court held that section 534 left the FBI "without authority to disseminate arrest records outside the Federal Government for employment, licensing or related

purposes...." *Menard v. Mitchell,* 328 F.Supp. 718, 727 (D.D.C.1971), *rev'd on other grounds sub nom. Menard v. Saxbe,* 498 F.2d 1017 (D.C.Cir.1974) (footnote omitted). Congress thereafter passed an appropriations act which explicitly gave the FBI the authority the district court had found lacking in section 534, and also passed acts apparently authorizing the Attorney General to release information from rap sheets to various establishments in the securities and commodities futures trading industries. *See supra* note 3. From these developments, the government argues that Congress necessarily understood section 534 as prohibiting release of rap sheets to any recipient not expressly authorized by the statute to receive them. We disagree. Section 534 by itself may not provide the Department authorization for release of rap sheets to the general public. But here Charles Medico's rap sheet is sought under the Freedom of Information Act, and that makes all the difference: the *Freedom of Information Act* is what authorizes (and requires) the Department of Justice to release rap sheets to any requester—unless, *inter alia,* section 534 brings rap sheets under the protection of Exemption 3 by explicitly exempting them from release. We simply do not find such an express exemption in section 534 and therefore hold section 534 is not an Exemption 3 withholding statute.[9]

---

7. *See generally Intelligence Activities, Senate Resolution 21: Hearings Before the Senate Select Comm. to Study Governmental Operations With Respect to Intelligence Activities,* 94th Cong., 1st Sess. (1975) (Vol. 6, Federal Bureau of Investigation).

8. Hoover also stated: "I feel these records should be inviolate and they should not be used for political or personal gain of any kind. Certainly, if the time comes when any private individual or agency can obtain the fingerprint identification record of the FBI on any individual, irreparable harm will result." *Departments of State and Justice, the Judiciary, and Related Agencies Appropriations for 1958: Hearings Before the Subcomm. on Dep'ts of State and Justice and the Judiciary and related Agencies Appropriations of the House Comm. on Appropriations,* 85th Cong., 1st Sess. 223 (1957) (statement of J. Edgar Hoover, Director, FBI). It is clear from the context of his testimony, however, that Hoover did not ask Congress to *prohibit* the FBI

from releasing rap sheets, but rather, sought only to *augment* FBI power over rap sheets. Hoover's seemingly pious words to the 1957 congressional committee are particularly ironic in light of revelations in subsequent years. *See supra* note 7.

9. Even if section 534 met Exemption 3's threshold requirement ("specifically exempted from disclosure") it would not appear to satisfy either prong of the exemption's proviso. The first prong, subsection (A), "embraces only those statutes incorporating a congressional mandate of confidentiality that, however general, is 'absolute and without exception,'" *American Jewish Congress v. Kreps,* 574 F.2d 624, 629 (D.C.Cir. 1978) (footnotes omitted), and "condones no decisionmaking at the agency level" on whether to release particular records to the public. *Founding Church of Scientology of Washington D.C., Inc. v. National Sec. Agency,* 610 F.2d 824, 827 (D.C.Cir.1979). Section 534, however, is

## II.

The government argues in the alternative that, even if Exemption 3 does not apply, Charles Medico's rap sheet, as well as "non-financial crime" information on records other than rap sheets, are covered by the law enforcement records privacy exemption, Exemption 7(C). This provision exempts "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy." Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, § 1802 (Oct. 27, 1986) (amending 5 U.S.C. § 552(b)(7)(C)). Reporters and Schakne, on the other hand, argue that the records should be examined under Exemption 6, covering "personnel and medical files and similar files the disclosure of which would constitute a *clearly* unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6) (1982) (emphasis added), because in their view the government has failed to make the showing necessary to meet the Exemption 7 threshold.[10] As is evident from the language of the two exemptions, Congress intended that it be easier for an agency to show that a record is exempt under the privacy test of 7(C) (once the agency has established that the record meets the Exemption 7 threshold) than for the agency to satisfy the privacy test of Exemption 6. Although the district court found the records Reporters and Schakne seek were acquired by the Department for law enforcement purposes and therefore meet the Exemption 7 threshold, we need not resolve that issue because, assuming *arguendo* that the district court was correct, we conclude the Department has failed to establish that release of the records "could reasonably be expected to constitute an unwarranted invasion of personal privacy," which of course means the Department has not made the more difficult showing required by Exemption 6 either.

We have held that the phrase "unwarranted invasion of personal privacy" requires a balancing of the "privacy interest" against the "public interest in disclosure." *Common Cause v. National Archives and Records Serv.,* 628 F.2d 179, 182 (D.C.Cir. 1980) (quoting *Getman v. NLRB,* 450 F.2d 670 (D.C.Cir.1971)). *See also Lesar v. Department of Justice,* 636 F.2d 472, 486

silent with respect to the general public. The most the statute could reasonably be said to *imply* is that since it gives the Department discretion, apparently unbounded, to withhold records from authorized government officials who disseminate the records to the public, it might also give the Department discretionary authority *to* withhold such records directly from the general public. That the government in fact treats any such restraint as discretionary can be seen from the Department's "wanted persons" regulation and policy on release of rap sheets to subjects of the rap sheets, *see supra* p. 733, as well as its actions during the course of this litigation, *see supra* p. 733.

Equally unpersuasive seems the government's alternative argument—that section 534 satisfies the second clause of the second prong of the proviso, subsection (B), because it "applies to a well-defined system of criminal history identification records." It is of course not enough that the statute refer to particular records: it must "refer[ ] to particular types of matters *to be withheld.*" 5 U.S.C. § 552(b)(3)(B) (1982) (emphasis added). The cases the government cites, *CIA v. Sims,* 105 S.Ct. 1881 and *Irons & Sears v. Dann,* 606 F.2d 1215, are distinguishable because in each of those cases Congress expressly gave the agency discretion to withhold a catego-ry of records from the public. Here, there was no such express delegation of discretionary authority. Moreover, far from referring to a narrowly-defined category of records, section 534 appears limitless in scope: it covers "identification, criminal identification, crime and *other records,*" (subsection (a)(1)) (emphasis added), as well as "information which would assist in the identification of any deceased individual" and the "location of any missing person," (subsections (a)(2) and (3)). In fact, Department counsel was unable to tell us where the outer boundary of "other records" lies.

**10.** Prior to the 1986 amendment of FOIA, this court held that to meet the threshold requirement for Exemption 7 a criminal law enforcement agency "must establish that its investigatory activities are realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached. Either of these concerns must have some plausible basis and have a rational connection to the object of the agency's investigation." *Pratt v. Webster,* 673 F.2d 408, 421 (D.C. Cir.1982). The 1986 amendment altered the threshold requirements for Exemption 7 by deleting reference to "investigatory records" and replacing it with "records or information."

(D.C.Cir.1980); *Fund for Constitutional Gov't v. National Archives and Records Serv.,* 656 F.2d 856, 862 (D.C.Cir.1981). The 1986 amendment to FOIA, which substituted "could reasonably be expected to" for "would" in Exemption 7(C), relieves the agency of the burden of proving to a certainty that release will lead to an unwarranted invasion of personal privacy, but does not otherwise alter the test. *See* 132 Cong.Rec. S14,296 (daily ed. Sept. 30, 1986) (statement of Sen. Leahy referring to S.Rep. No. 221, 98th Cong., 1st Sess. 24–25 (1983)); 132 Cong.Rec. H9462 (daily ed. Oct. 8, 1986) (statement of Rep. English); 132 Cong.Rec. S16,496 (daily ed. Oct. 15, 1986) (statement of Sen. Leahy). That balancing is to be done by the district court "de novo," 5 U.S.C. § 552(a)(4)(B), *see Department of the Air Force v. Rose,* 425 U.S. 352, 380, 96 S.Ct. 1592, 1608, 48 L.Ed.2d 11 (1976), and we give deference to the district court to the extent the court does not "misapprehend the law or overlook a crucial policy concern." *International Bhd. of Elec. Workers, Local 41 v. Department of Housing and Urban Dev.,* 763 F.2d 435 (D.C.Cir.1985) (an Exemption 6 case).

The district court determined that any non-financial crime information on the requested records regarding Charles Medico is "personal" to him, meaning presumably that he has a privacy interest in it. Further, the court concluded that "it seems highly unlikely" that such information has any public interest, or relevance to the purpose behind Reporters' and Schakne's request—because the offenses (if any) were "minor" and occurred over thirty years ago. Reporters and Schakne argue that the district court (1) failed to consider that any privacy interest in the information sought was "sharply attenuated" by the fact that the information was "already available in the official record," and (2)

undervalued the public interest that might be served by release of the records.

### A. *Privacy Interest*

This case raises the novel question whether, and to what extent, "personal privacy" would be invaded by the Department of Justice's release of arrest, indictment, conviction and imprisonment records that are made available by municipal, state or federal agencies to any member of the general public. If there is no privacy interest at all in such records, then, of course, no privacy is invaded. The ordinary meaning of privacy suggests that Exemption 7(C) does not exempt records consisting of information that is publically available. The first definition for "private" in Webster's Third New International Dictionary is: "intended for or restricted to the use of a particular person or group or class of persons: not freely available to the public." What is encompassed by the "personal privacy" language of FOIA is, of course, a question of legislative intent, but there is no suggestion in the legislative history of Exemption 7(C) that "privacy" as used in the exemption has other than its ordinary meaning. Congressional debate over the 1986 amendment to Exemption 7(C) merely repeated the words of the statute: "personal privacy." *See, e.g.,* 132 Cong.Rec. S16,-496 (daily ed. Oct. 15, 1986) (statement. of Sen. Leahy). In opposing Exemption 7(C) in 1974 as overly narrow, Senator Hruska argued on the senate floor that "the release of any material [from FBI files] into the public domain is likely to cause embarrassment to individuals mentioned in FBI files." 120 Cong.Rec. 17,036 (1974). That at least suggests that the exemption was directed at (although in the senator's view did not adequately protect against) unwarranted release of information *not yet in* the public domain. This interpretation finds support in the 1965 Senate Report on Exemption 6,[11] which explained that "[t]he

---

**11.** It is appropriate to look to Exemption 6 in interpreting Exemption 7(C) because the sponsor of the amendment that led to the original Exemption 7(C) in 1974 explained on the senate floor, "By adding the protective language here, we simply make clear that the protections in the sixth exemption for personal privacy also apply

to disclosure under the seventh." 120 Cong.Rec. 17,033 (1974) (statement of Sen. Hart). Although the proposal was subsequently altered by deletion of the word "clearly" in response to concerns expressed by President Ford, *see* 120 Cong.Rec. 33,158–59, 34,162–63 (1974), and Exemption 7(C) was amended in 1986, *see supra* p.

phrase 'clearly unwarranted invasion of personal privacy' enunciates a policy that will involve a balancing of interests between the protection of an individual's *private affairs* from unnecessary public scrutiny, and the preservation of the public's right to governmental information." S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965) (emphasis added). The term "private affairs" would not seem to cover information that is legally available to the public at large.

To be sure, this court has recognized an Exemption 7(C) privacy interest in names of subjects of an FBI investigation even though the names had already been widely publicized in the media. We held that such publicity "in no way undermines the privacy interests of these individuals in avoiding harassment and annoyance that could result should the FBI *confirm* ... the presence of their names in the ... documents." *Weisberg v. Department of Justice*, 745 F.2d 1476, 1491 (D.C.Cir.1984). The crucial difference between *Weisberg* and this case, however, is that the records in *Weisberg* related to a confidential investigation, whereas Reporters and Schakne seek records that local, state or federal political bodies have decided should be available to the public.

The government claims, nevertheless, that the same principle should apply to this type of case because it is a great deal more difficult "as a practical matter" for a requester to obtain the same public record information from the primary sources than it is to simply obtain it from the FBI's efficient record system. The requester may, we recognize, not even be aware in a given case which jurisdictions hold the records sought or indeed whether or not records exist. The subject, therefore, in the government's view, has a concern in

maintaining difficulty of access to his public records. That may well be so, but it is not apparent to us how that concern equates to a "privacy" interest within the meaning of the statute, or how it would be measured. At oral argument government counsel contended that if the release of records causes any embarrassment or harm to a subject's reputation, then such release necessarily results in an "invasion of personal privacy." The privacy interest, in the government's view, is congruent with the degree of embarrassment the release of records would cause. That argument, it seems to us, proves too much. Virtually any unflattering information, even already well-distributed in the public domain, may cause further embarrassment when reintroduced. The government's position, we concede, is attractive as a legislative policy matter. We all cherish the notion that our past mistakes will be forgotten, and most of us—particularly lawyers and judges—share a distaste for the widespread publication of such information as arrest records that will surely harm some innocent targets. But we cannot find in the FOIA or its legislative history any support for the government's expansive interpretation of privacy.[12]

Two Supreme Court decisions touch tangentially on the issue we face. In *Department of State v. Washington Post Co.*, the Court said in dicta that where information is "a matter of public record," for example, "past criminal convictions," "[t]he public nature of [the] information may be a reason to conclude, under all the circumstances of a given case, that the release of such information would not constitute a 'clearly unwarranted invasion of personal privacy [under Exemption 6] ...,'" 456 U.S. 595, 602–03 n. 5, 102 S.Ct. 1957, 1961–62 n. 5, 72 L.Ed.2d 358 (1982). This seems to imply

738, the underlying similarity between the two exemptions remains.

**12.** The 1966 House Report on FOIA states, "The limitation of a 'clearly unwarranted invasion of personal privacy' provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information by excluding those kinds of files the disclosure of which

might harm the individual." H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966), U.S.Code Cong. & Admin.News 1966, p. 2428. This sentence of course would not exempt *all* records "the disclosure of which might harm the individual." We believe it is similarly unsupportive of the proposition that *all* releases of records that harm an individual invade a privacy interest.

the existence of a low-level privacy interest in criminal records *despite* their public availability somewhere in the nation. And this proposition finds some further support in *Cox Broadcasting Corp. v. Cohn,* a case resting on the intersection between the common law of privacy and the First Amendment. There, a newspaper had published the name of a victim of a crime which it had obtained from a judicial record open to public inspection, and the Court stated, "[T]he prevailing law of invasion of privacy generally recognizes that the interests in privacy *fade* when the information involved already appears on the public record." 420 U.S. 469, 494–95, 95 S.Ct. 1029, 1045–46, 43 L.Ed.2d 328 (1975) (emphasis added). Thus, *Department of State* and *Cox Broadcasting* suggest that the initial step in an Exemption 7(C) analysis should be to determine whether the requested information is a matter of public record. If the information is truly on the public record, then the privacy interest, while not eliminated, is weakened considerably, and the privacy interest/public interest balance affected accordingly.

■ The phrase "public record" implies, we believe, a good deal more than that the information be available. It means that a local, state or federal political body has made an affirmative determination that criminal records must be freely available to the general public and has provided a mechanism to ensure the implementation of that policy. If a local law enforcement official provides criminal information episodically, or to only certain requesters, that, in our view, would be inadequate to cause the privacy interest in those criminal records to fade significantly. That situation comes close to *Weisberg.* Of course it also follows that if criminal records are expunged by the primary source they can no longer be regarded as public. But if, for example, a state legislature requires arrests and convictions to be recorded and made freely available to the general public, any privacy interest in those records seems insignificant. Since the district court did not consider whether Charles Medico's criminal records, if any, are publicly available in the sense we have discussed, it

"misapprehend[ed] the law," *International Bhd. of Elec. Workers,* 763 F.2d at 435; it did not focus on what the Supreme Court referred to as the "fade[d]" nature of this kind of privacy interest.

### B. *Public Interest in Disclosure*

The public interest in disclosure arises from the public's "right to governmental information." S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965); H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11 (1966), U.S.Code Cong. & Admin.News 1966, p. 2428. Its measure is "the public benefit gained from making information freely available." *Board of Trade of the City of Chicago v. Commodity Futures Trading Comm'n,* 627 F.2d at 398. As we noted, the district court regarded Department of Justice records (other than rap sheets) containing "non-financial crime" information on Charles Medico to be of little or no public interest, and declined to find the public interest enhanced by the purpose of the request or status of the requesters. Extending our analysis to cover rap sheets, we must decide whether this determination "misapprehends the law." *International Bhd. of Elec. Workers,* 763 F.2d at 435. We observe at the outset the awkwardness of the federal judiciary appraising the public interest in the release of government records. Normally an administrative agency would make a decision of that sort in the first instance, and a court would review it only for reasonableness. Our difficulty arises out of the dilemma Congress faced: as we discussed above, because agencies have a strong interest in preserving the secrecy of their own records and are naturally disposed to resist certain disclosures, Congress decided that the judiciary should review the propriety of an agency's withholding *de novo,* 5 U.S.C. § 552(a)(4)(B) (1982).

■ Reporters and Schakne ask only for records, if they exist, composed of information that local, state and federal political bodies decided to make public. We note, as did the Supreme Court, that "[b]y placing the information in the public domain ... the State must be presumed to have con-

cluded that the public interest was thereby being served." *Cox Broadcasting*, 420 U.S. at 495, 95 S.Ct. at 1046. Yet the district court, after an *in camera* review, found the public interest in such records to be insignificant—because the records sought presumably relate to crimes or possible crimes that were "minor," and because the events occurred some years ago. We, however, believe the district court should first have looked to state determinations of the "public interest." If the records contain entries drawn from state public records of the kind we have discussed, it would seem anomalous and indeed unseemly for a federal judge to, in effect, overrule a state political body's determination that publication *is* in the public interest.[13] We see no principled basis by which a court can determine that a crime is so "minor" that information regarding it, which a state considered significant enough to place on the public record, is in reality of little public interest.[14] Nor can we say that an older public record has lost its public interest—old records may have historical importance. To be sure, as newspaper readers we might opine that one story is more *interesting* than another, or even more politically significant. But surely Congress could not have intended federal judges to make such idiosyncratic determinations. Indeed, had Congress done so, the task thus entrusted to the federal judiciary might arguably exceed Article III limitations. *See Keller v. Potomac Electric Co.*, 261 U.S. 428, 440–44, 43 S.Ct. 445, 447–49, 67 L.Ed. 731 (1923). *See also Illinois v. United States*, 460 U.S. 1001, 1004–06, 103 S.Ct. 1240, 1242–43, 75 L.Ed.2d 472 (1983) (Rehnquist, J., dissenting). It follows then that we should seek objective indications of the public interest against which to balance whatever privacy interests are at stake. We conclude, therefore, that when political bodies have determined the records at issue do have a continuing public interest, the federal judiciary is not in a position to dispute or minimize that determination.[15]

■ Reporters and Schakne argue that the public interest is enhanced because the records are sought by representatives of the news media, for the purpose of aiding their private investigation of an allegedly corrupt U.S. congressman. Charles Medico, we are told, worked for a company that received federal funds via dealings with this congressman, and thus Charles Medico's criminal records might provide clues for the investigation. The court, however, cannot inquire into the occupation of the requester when determining whether a record is exempt under FOIA. The statute indicates on its face that information is to be made available equally to all, by stating that agencies shall make records available "to any person." 5 U.S.C. § 552(a)(3) (1982). *See Grumman Aircraft Eng'g Corp. v. Renegotiation Bd.*, 425 F.2d 578, 582 n. 14 (D.C.Cir.1970); *Sterling Drug Inc. v. Federal Trade Comm'n*, 450 F.2d 698, 704 n. 4 (D.C.Cir.1971). The legislative history of FOIA confirms that Congress' intention was to "eliminate[ ] the test of who shall have the right to different information." S.Rep. No. 813, 89th Cong., 1st Sess. 5 (1965). "[T]he Act clearly intended to give any member of the public as much right to disclosure as one with a special interest therein." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975). FOIA thus "precludes consideration of the interests of the party seeking relief," *Soucie v.*

---

**13.** Our concurring colleague apparently regards this kind of deference to the political determinations of mere state legislatures as *lèse majesté*. We, on the other hand, are less confident of our ability as judges to so precisely perceive the public interest.

**14.** With all respect to our concurring colleague, this is not a case about traffic tickets. *But see* Concurring Opinion at 5. And even if we felt competent to label the recorded offenses as of little public interest, which we do not, we would also likely recognize that any privacy interest in

such information would be equally inappreciable.

**15.** Congress could of course decide the public ought not have access to federal compilations of public criminal records. Congress has considered such a possibility in the past, and might do so again. *See, e.g., Dissemination of Criminal Justice Information: Hearings on H.R. 188, H.R. 9783, H.R. 12574, and H.R. 12575 Before the Subcomm. on Civil Rights and Constitutional Rights of the House Comm. on the Judiciary*, 93d Cong., 2d Sess. (1973).

*David,* 448 F.2d 1067, 1077 (D.C.Cir.1971), and "[t]he focus is not on the applicant but on an abstract person...." *Sterling Drug,* 450 F.2d at 704 n. 4. "Congress granted the scholar and the scoundrel equal rights of access to agency records." *Durns v. Bureau of Prisons,* 804 F.2d 701, 706 (D.C.Cir.1986). *Cf. National Treasury Employees Union v. Griffin,* 811 F.2d 644, 649 (D.C.Cir.1987) ("legislative history of [FOIA] *fee waiver* provision indicates special solicitude for journalists" (emphasis added)); Freedom of Information Reform Act of 1986, Pub.L. No. 99–570, § 1803 (Oct. 27, 1986) (to be codified at 5 U.S.C. § 552(a)(4)(A)(ii)(II)).

 For similar reasons, the court should not attempt to determine the public interest in release of criminal records based on the specific purpose of the request. Certainly the requesters' goal in this case, exposing "the potential abuse of government funds," is of public interest—but the difficulty is that the public interest does not stop there. We *as judges* are unable to distinguish between the public interest in different criminal records based on the specific intent behind the request, or, for that matter, normally, the identity of the subject of the criminal record.[16] This circuit did follow a different approach in *Getman v. NLRB,* an Exemption 6 case in which NLRB records were sought by university professors to aid their study of the agency. The court evaluated the public interest by weighing the purpose of the study and even the quality of the study itself. 450 F.2d 670, 675 (D.C.Cir.1971). *See also Rural Housing Alliance v. Department of Agriculture,* 498 F.2d 73, 77 (D.C.Cir.1974). But the Supreme Court in *FBI v. Abram-son* rejected the *Getman* approach,[17] stating flatly, "Congress did not differentiate between the purposes for which information was requested." 456 U.S. 615, 631 102 S.Ct. 2054, 2064, 72 L.Ed.2d 376 (1982).[18] If a record must be released under FOIA when requested by a news reporter for the purpose of publication, it must be released upon request of an ordinary citizen. Thus Reporters' and Schakne's precise journalistic purpose in seeking the records is irrelevant to a determination of the public interest under Exemption 7(C). *Cf. Griffin,* at 649 ("furnishing journalists with information will *primarily* benefit the general public" (emphasis added)). And, therefore, the district court also was in error because it based its determination of the public interest partly on a finding that the records sought "are completely unrelated to anything now under consideration by the plaintiffs." Indeed, this approach would seem to place the district court in a role somewhat akin to that of an editor. Reporters and Schakne revealed the focus of their investigation, and the court declared the information sought was irrelevant—in effect deciding what was or was not important to their story. Rather, the district court should have determined only the interest of the general public in release of the records themselves.

\* \* \* \* \* \*

 We therefore remand this case to the district court to make a determination as to whether the Department of Justice holds criminal record information that, in accordance with our opinion, must be disclosed. Since appellants would be entitled only to information on Charles Medico that is a matter of public record, the Depart-

---

**16.** In *Stern v. FBI,* this court did distinguish between the public interest in the identity of a high-level FBI employee who knowingly obstructed justice and that of low-level FBI employees who only inadvertently contributed to the wrongdoing. *Stern v. FBI,* 737 F.2d 84, 93–94 (D.C.Cir.1984). We are of course bound by *Stern,* but do not believe its holding governs this case.

**17.** To be sure, *Abramson* was an Exemption 7 case, and *Getman* Exemption 6. But *Abramson* relied on *Sears* for this proposition—and *Sears* is an Exemption 5 case. Thus the Court in

*Abramson* appeared to refer to the FOIA as a whole, not just Exemption 7. In any event, *see supra* note 11.

**18.** The concurring opinion apparently believes the Supreme Court's language overly broad. *See* Concurring Opinion at 745. We take the Court to disapprove of the very kind of ad hoc "judicial weighing of the benefits and evils of disclosure" reflected in some past opinions of this court on which our colleague relies. *Abramson,* 456 U.S. at 631, 102 S.Ct. at 2064.

ment would of course not be obliged to disclose any other information if exempt under 7(C). If it is for any reason unclear as to whether information held by the Department is publicly available at the original source, the district court should consider whether the Department might satisfy its obligation under FOIA, if it so proposes, by merely referring appellants to the law enforcement agency that provided the information to the Department.[19]

*It is so ordered.*

STARR, Circuit Judge, concurring in the judgment and concurring in part:

I concur in the judgment to remand to the District Court for its reassessment of the privacy interest-public interest balance. I also concur in all of the court's opinion save for section II B. For the reasons that follow, I believe the public-interest analysis contained in that section is flawed.[1] Specifically, I find the majority's approach to collapse improperly a Congressionally-mandated balancing process into a single-factor test; in the process of this curious metamorphosis, the majority has, with all respect, ignored a number of factors that should figure into a proper assessment of the public interest.

The dominant objective of FOIA is, of course, disclosure, as the court rightly recognizes. *See* Opinion at 734. But Congress has also determined that under certain circumstances the public's right of access should yield to legitimate privacy interests. Exemption 7(C) sets forth one such circumstance. As recently amended by the Freedom of Information Reform Act

of 1986, Exemption 7(C) shields from disclosure

> records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ... could reasonably be expected to constitute an unwarranted invasion of personal privacy.

5 U.S.C. § 552(b)(7)(C) (codification of Pub.L. No. 99–570, § 1802 (Oct. 27, 1986)). There can be no doubt that on its face the FOIA request here seeks "law enforcement records or information." *See* J.A. at 14 (original FOIA request).

Unlike many of the other FOIA Exemptions, literal compliance with the terms of Exemption 7(C)—that is, a finding that the requested information was "compiled for law enforcement purposes"—leads not to automatic withholding but rather triggers a balancing process. *See Lesar v. Department of Justice*, 636 F.2d 472, 486 n. 80 (D.C.Cir.1980); *cf.* 2 J. O'Reilly, *Federal Information Disclosure* § 16.07, at 16–19 (1985) (discussing this aspect of analogous Exemption 6). This balancing process is suggested by the language of Exemption 7(C); the choice of the term "unwarranted," which connotes balancing, indicates that Congress impliedly directed such an approach. This assumption is confirmed by the legislative history. As the Supreme Court has noted, "[b]oth [the] House and Senate Reports can only be read as disclosing a congressional purpose ... to require a balancing of interests." *Department of the Air Force v. Rose*, 425 U.S. 352, 372, 96

**19.** Reporters and Schakne have asked for an award of litigation costs and attorneys fees pursuant to 5 U.S.C. § 552(a)(4)(E) (1982). On remand, the district court should determine whether plaintiffs have "substantially prevailed," and if so, whether an award "is necessary to implement the FOIA." *Nationwide Bldg. Maintenance, Inc. v. Sampson*, 559 F.2d 704, 715 (D.C.Cir.1977). *See also Weisberg*, 745 F.2d at 1498.

**1.** Were we writing on a blank slate, I would also conclude that, by virtue of the care and rigor with which Attorney General Bell and other high ranking officials of the Department analyzed section 534, *Chevron*-style deference would be appropriate so as to trigger Exemption

**3.** Indeed, the principle of judicial deference to reasonable administrative interpretations of ambiguous statutes is particularly forceful where, as here, that interpretation has been rendered by the head of the Executive Branch Department charged with the statute's application after a careful and painstaking deliberative process. *Cf. Church of Scientology v. IRS*, 792 F.2d 153, 164 (D.C.Cir.1986) (Silberman, J., concurring), *cert. granted,* — U.S. —, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987). But at this point, too much water is over the dam in the way of FOIA caselaw to examine what should be an interplay between the clear strictures of *Chevron* and the exacting demands of FOIA decisional law.

S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976).[2] Moreover, this balancing is to be conducted by the courts *de novo.* 5 U.S.C. § 552(a)(4)(B); *see Lesar,* 636 F.2d at 486; *cf. Rose,* 425 U.S. at 379, 96 S.Ct. at 1607 (Exemption 6).

Thus, it is hardly surprising that a balancing requirement is firmly embedded in the law of this circuit. In *Baez v. Department of Justice,* 647 F.2d 1328 (D.C.Cir. 1980), for example, we held that to assess properly an Exemption 7(C) claim—that is, to determine whether disclosure would lead to "an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C)—we "must balance the privacy interest involved against the public interest in disclosure." 647 F.2d at 1338. The *Baez* court, speaking through Judge Wilkey, then proceeded to strike the balance in favor of privacy interests, discerning in that case "no identifiable public interest in the[ ] materials." *Id.* at 1338–39. But the court reached this conclusion only after examining "the other side of the balance," namely the public interest in disclosure. *Id.* at 1338; *see also Common Cause v. National Archives and Records Service,* 628 F.2d 179, 182 (D.C. Cir.1980); *Lesar,* 636 F.2d at 486.

The court acknowledges and purports to follow this balancing requirement, even citing some of these same cases. *See* maj. op. at 737. In reality, however, the majority collapses the entire balancing process into a single determination, namely whether a federal or state political body determined at some time that the requested information should be "public." *See* maj. op. at 740–41. I recognize this determination properly impacts both sides of the Exemption 7(C) balance, and I agree fully with the manner in which the court has incorporated this factor into its privacy-interest analysis. *See* maj. op. at 738–40. But the majority has fallen into error by making this *identical* determination the *sole* feature of its

public-interest inquiry. I respectfully disagree with that approach.

The majority reveals at the outset what animates its search for an easy-to-apply, single-factor test, namely, "the awkwardness of the federal judiciary appraising the public interest in the release of government records." Maj. op. at 740. This concern sends the majority on a quest for someone to defer to, maj. op. at 738–39; and leads directly to the development of a deference-based public-interest analysis—that is, if the requested material is "information that local, state and federal political bodies decided to make public," *id.* at 740, then a significant public interest in the material exists.

While I share the majority's concern that the judiciary is ill-equipped to make value-laden judgment calls such as assessing the extent of the "public interest," I am nonetheless persuaded that Congress has, in essence, put us in the business of doing just that. It is, after all, Congress that has directed the courts to engage in *de novo* balancing. *See* 5 U.S.C. § 552(a)(4)(B). Indeed, the majority concedes as much by noting after its reference to the awkwardness of the judiciary's role that "Congress decided that the judiciary must review the propriety of withholding *de novo.*" Maj. op. at 740.

Thus, our duty is clear. Yet, the majority decides to go AWOL, as it were, by failing entirely to heed Congress' directive. Instead of *de novo* balancing, the court's "analysis" is reduced to deferential rubber-stamping. I have no doubt that the determinations of federal or state political bodies as to the "public" nature of information should play a role, perhaps even a large role, in a proper public-interest analysis. But I am unable to conclude, as my colleagues do, that this single factor should constitute the *whole* of the analysis. The generalized policy determination that a cat-

---

**2.** *Rose* was, of course, an Exemption 6 case. Nonetheless, its teaching in this respect applies fully to the Exemption 7 setting. As Judge Wilkey aply put it in speaking for the court in *Lesar v. Department of Justice,* 636 F.2d 472, 486 n. 80 (D.C.Cir.1980), an Exemption 7(C) case, "Exemption 7(C) and Exemption 6 run contrary to

the theory of other exemptions. Here the court is called upon to balance tne conflicting interests and values involved; in other exemptions Congress has struck the balance and the duty of the court is limited to finding whether the material is within the confined category." *See also* maj. op. at 738 n. 11, 742 n. 17.

egory of materials warrants disclosure does not mean that a "public interest" within the meaning of FOIA attaches to every scrap of paper falling within that category.

In the process of championing a transformation of a two-sided balancing process into a single-factor test, the court rejects consideration of several factors that should figure in a determination of the "general public interest. *See* maj. op. at 742 (noting that the District Court should determine "the interest of the general public in release of the records themselves"). In the circumstances of this case, for example, it seems powerfully relevant that the offenses reflected on the requested records are minor and occurred a long time ago. A traffic ticket, let us say, scarcely partakes of the nature of an arrest, hypothetically, for murder.

So too, the specific purpose of the request should be relevant. In the context of this case, the fact that the records are sought by representatives of the media for the avowed purpose of exposing the possible misuse of government funds—rather than by some idiosyncratic individual seeking to satisfy a mere curiosity about criminal records—should be a factor in the public-interest determination. As the court candidly notes, this is exactly the approach this circuit followed in *Getman v. NLRB*, 450 F.2d 670, 675 (D.C.Cir.1971), and other cases. *See* Opinion at 742 (citing *Getman* and *Rural Housing Alliance v. Department of Agriculture*, 498 F.2d 73, 77 (D.C. Cir.1974)); *see also Fund for Constitutional Government v. National Archives*, 656 F.2d 856, 866 (D.C.Cir.1981) (examining

purpose for request, finding a "general public curiosity" to be insufficient).

The court, however, declines to follow these precedents, explaining its refusal by pointing to *FBI v. Abramson*, 456 U.S. 615, 102 S.Ct. 2054, 72 L.Ed.2d 376 (1982): "[T]he Supreme Court in *FBI v. Abramson* rejected the *Getman* approach." Opinion at 742. With all respect, I can discern no such rejection in my reading of *Abramson*.

The majority's analysis of *Abramson* is grounded upon that opinion's statement that "Congress did not differentiate between the purposes for which information was requested." 456 U.S. at 631, 102 S.Ct. at 2064. While on its face, this statement indeed appears to reject *Getman*'s approach, the context of the statement makes clear that the Court's point was quite different.[3] Specifically, the *Abramson* Court was rejecting a claim that "Congress' undeniable concern with possible misuse of governmental information for partisan political activity is the equivalent of a mandate to release any information which might document such activity." *Id.* As the Court made even more clear later in the solitary paragraph of relevance to our discussion, the contention it faced in *Abramson* was that *despite* the concession that an unwarranted invasion of privacy would result from disclosure, *see id.* at 623, 102 S.Ct. at 2060, Exemption 7 should not apply due to the purpose of the request. The Court disagreed, concluding as follows:

[T]he Act require[s] assessment of the harm produced by disclosure of certain types of information. Once it is established that information was compiled pursuant to a legitimate law enforcement

---

**3.** *Abramson* involved a FOIA request for documents sent by the FBI to the White House in 1969. The documents were prepared at White House request, rather than compiled for law enforcement purposes, but it was undisputed that the information reported in the documents "was originally compiled for law enforcement purposes." 456 U.S. at 623, 102 S.Ct. at 2060. It was similarly undisputed that "disclosure of [the] information would be an unwarranted invasion of privacy." *Id.* Thus, the only question facing the Court was whether material admittedly properly within Exemption 7(C) lost its exempt status when it was incorporated into a document that did not meet the Exemption 7

threshold requirement, namely, that it was not compiled for law enforcement purposes. The *Abramson* Court itself seemed to recognize it was facing a narrow issue: "The sole question for decision is whether information originally compiled for law enforcement purposes loses its Exemption 7 protection if summarized in a new document not created for law enforcement purposes." *Id.* Moreover, the language relied upon by the majority is contained in a single paragraph in a section devoted to disposing of "several other arguments," *id.* at 629, 102 S.Ct. at 2063, after the basic legal issue in the case had been discussed. *See id.* at 623–29, 102 S.Ct. at 2060–63.

investigation and that disclosure of such information would lead to one of the listed harms, the information is exempt. Congress thus created a scheme of categorical exclusion; it did not invite judicial weighing of the benefits and evils of disclosure on a case-by-case basis.

*Id.* at 631, 102 S.Ct. at 2064 (footnote omitted). Obviously, the Court was considering a later phase of the inquiry under Exemption 7, *after* the "harms" determination (resulting from the balancing process) had been made. *See* 456 U.S. at 623, 102 S.Ct. at 2060 (reporting that all parties agreed that "the disclosure of such information would be an unwarranted invasion of privacy"). At that stage—i.e., after the "harms" portion of the Exemption 7 analysis has been completed—the purpose of the FOIA requester is no longer legally relevant; for if one of the enumerated harms is present, then the exemption from mandatory disclosure is established. At that late stage, in short, there is to be no further judicial weighing of competing interests.

But the *Abramson* Court was by no means purporting to ban "judicial weighing" to determine whether one of the listed harms is present in the first instance. One of the "listed harms" to which the Court alluded is, of course, "an unwarranted invasion of privacy." *See* 5 U.S.C. § 552(b)(7)(C). As we have seen, to assess this "harm," Congress has mandated that the courts engage in *de novo* balancing. Thus, *Abramson*'s general statement has no bearing on what factors may be relevant to the "unwarranted invasion" determination and the public-interest assessment subsumed under that determination. Accordingly, the purpose of the request, in my view, should figure into a proper Exemption 7(C) balancing.

In sum, the majority's public-interest analysis is but a rehashing of its privacy analysis; the two determinations, required by Congress to comprise opposite sides of a *de novo* balancing process, have been collapsed into a single factor. Consistent with Congress' balancing requirement, this circuit has until today engaged in a fairly detailed assessment of the public interest, carefully calibrating the level of that interest depending on factors such as the precise information sought, *see, e.g., Stern v. FBI,* 737 F.2d 84, 93–94 (D.C.Cir.1984) (differentiating between level of public interest due to relative rank of FBI officials), and the purpose of the request, *see, e.g., Fund for Constitutional Government,* 656 F.2d at 866 ("general public curiosity" insufficient). Viewed against the backdrop of these circuit precedents, not to mention Congress' *de novo* balancing requirement, the court's deferential, hands-off approach is difficult to justify in law. Because I believe the federal courts are duty-bound, for better of worse, to perform the task Congress has assigned us, I cannot join in section II B of the court's opinion.