Brian **DICKERSON,** Plaintiff–Appellant,

v.

**DEPARTMENT OF JUSTICE,**
Defendant–Appellee.

No. 92–1458.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 19, 1993.

Decided April 30, 1993.

Herschel P. Fink (argued and briefed), Michael A. Gruskin (briefed), Steven M. Ribiat, Honigman, Miller, Schwartz & Cohn, Detroit, MI, for plaintiff-appellant.

L. Michael Wicks, Asst. U.S. Atty., Detroit, MI, Stephen G. Harvey, Leonard Schaitman, U.S. Dept. of Justice, Appellate Staff, Civil Div., Scott R. McIntosh (argued and briefed), U.S. Dept. of Justice, Appellate Div., Washington, DC, for defendant-appellee.

Before: NELSON and BATCHELDER, Circuit Judges; and BECKWITH, District Judge.*

DAVID A. NELSON, Circuit Judge.

Pursuant to the Freedom of Information Act—a statute which, subject to certain exceptions, makes federal government records available to anyone who asks for them— plaintiff Brian Dickerson requested the release of records on an investigation conduct-

* The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

1. The phrase originated with Senator Hart, a supporter of Freedom of Information Act amend-

ed by the Federal Bureau of Investigation into the disappearance of Jimmy Hoffa, former president of the Teamsters Union.

Citing 5 U.S.C. § 552(b)(7)(A), which exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings," the government denied the request. Mr. Dickerson brought suit in the Eastern District of Michigan to compel the Department of Justice to produce the records. The district court (La Plata, J.) ultimately decided that production was not required.

In making its decision the district court focused on the question whether a "concrete prospective law enforcement proceeding"[1] could still be discerned—*i.e.*, whether there was still a reasonable chance that someone would be prosecuted in connection with Mr. Hoffa's disappearance. Based on affidavits of several FBI officials and an *in camera* review of FBI file documents assembled for the purpose of briefing one of the affiants on the status of the investigation, the district court found that "the investigation into Hoffa's disappearance is active and continuing, with the clear direction of future criminal proceedings being instituted." The court further found that disclosure of the requested documents could reasonably be expected to interfere with such proceedings. The court made these findings without having required the government to provide a document-by-document analysis of the files.

The issues presented on appeal are (1) whether the district court abused its discretion in not insisting on a full document-by-document analysis and in limiting its *in camera* review to the briefing materials; (2) whether the district court dealt correctly with the factual side of the case; and (3) whether the district court ought to have found that at least some non-public portions of the investigatory files were not protected

ments adopted in 1974. See 120 Cong.Rec. 17033 (1974), quoted in *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232, 98 S.Ct. 2311, 2322, 57 L.Ed.2d 159 (1978).

from disclosure. Resolving each of these issues in favor of the government, we shall affirm the judgment of the district court.

## I

Jimmy Hoffa disappeared in Detroit, Michigan, on July 30, 1975. It is widely believed that he was abducted and killed. Mr. Hoffa's disappearance led to an FBI investigation that has not, to date, resulted in any criminal proceedings being brought.

The investigation is documented in two large files, one maintained in the FBI's field office in Detroit and the other at FBI headquarters in Washington. At the time with which we are concerned in this proceeding the headquarters file consisted of 67 volumes and the field office file consisted of 332 volumes.

On July 25, 1989, counsel for the *Detroit Free Press*, a newspaper that employs plaintiff Dickerson in an editorial capacity, sent sweeping Freedom of Information Act requests on the Hoffa investigation to Justice Department and FBI officials in Detroit and Washington. When the requests were denied, Mr. Dickerson sued the Department of Justice under 5 U.S.C. § 552(a)(4)(B), which gives federal district courts jurisdiction to order the production of agency records withheld improperly. This section of the statute, which places the burden of sustaining nondisclosure on the government, directs the court to determine the matter *de novo*. It also provides that the court "may examine the ... agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in [5 U.S.C. § 552(b)]...."

The Department of Justice filed an answer admitting that there were no pending criminal proceedings directly relating to Mr. Hoffa's disappearance, but asserting that no documents had been improperly withheld. Both parties subsequently moved for summary judgment.

The plaintiff's summary judgment motion was accompanied by newspaper articles referring to a statement by Kenneth P. Walton, a retired head of the FBI's Detroit field office, to the effect that although he knew who had murdered Jimmy Hoffa, there would never be a prosecution because of the government's unwillingness to disclose confidential sources. The Justice Department filing was accompanied by "declarations," or affidavits, in which two FBI headquarters officials, Angus B. Llewellyn and Jim E. Moody, attested that the Hoffa investigation was still pending.

The Llewellyn declaration went on to give a general description of the contents of the investigatory files, categorizing the records by source or function. The declaration also sought to explain why law enforcement records contained in the files were exempt from production not only under subsection (7)(A) of 5 U.S.C. § 552(b), but also under subsection (7)(C) (exempting such records if they "could reasonably be expected to constitute an unwarranted invasion of personal privacy"); subsection (7)(D) (exempting them if they "could reasonably be expected to disclose the identity of a confidential source"); and subsection (7)(E) (exempting them if they "would disclose techniques and procedures for law enforcement investigations or prosecutions ... if such disclosure could reasonably be expected to risk circumvention of the law").

The Moody declaration focused on the (7)(A) exemption. The declaration explained, among other things, that

"The files responsive to plaintiff's [Freedom of Information Act] request contain documents detailing the FBI's theories regarding the case, investigative leads we're pursuing (and those we don't consider worthy of pursuit), information furnished by confidential sources, information indicating whom the prime suspects are considered to be, techniques being utilized by the FBI in this investigation, interviews of third parties and cooperating witnesses, results of laboratory and polygraph examinations, and suggestions as to how to proceed with this investigation."

The Moody declaration stated that the FBI was continuing its efforts to develop information for use in criminal proceedings, and the declaration sought to show why production of

the records could reasonably be expected to interfere with such proceedings.

In January of 1991 the district court denied both of the motions for summary judgment on the ground that there was a material issue of fact concerning the prospect of future enforcement proceedings. The Justice Department moved for reconsideration, supporting its motion with a declaration executed by William M. Baker, the Assistant Director of the FBI in charge of the agency's Criminal Investigation Division.

Mr. Baker declared under penalty of perjury that it was his responsibility to determine whether the investigation into the Hoffa disappearance should be pursued; that in his judgment the investigation warranted the continuing efforts of the FBI; that he had allocated continued FBI resources to the investigation; that he believed "that the person(s) responsible for Mr. Hoffa's disappearance can be identified and prosecuted;" and that public disclosure of the information in the Hoffa file could reasonably be expected, for reasons specified in the declaration, to interfere with enforcement proceedings against those responsible for the disappearance. Mr. Baker further declared that the statement attributed to the former field office head "did not reflect and does not reflect official FBI policy."

■ In response to the motion for reconsideration plaintiff Dickerson filed a reply brief stating that Mr. Baker's declaration was essentially identical to one he had filed in a Freedom of Information Act suit brought in a federal district court in Missouri by Mr. Hoffa's daughter, Barbara Crancer. The brief pointed out that the declaration

had not dissuaded the district court in Missouri from ordering the government to submit a *Vaughn* index on the smaller of the two Hoffa files,[2] and it noted that FBI Director William Sessions had testified before a Senate Subcommittee that it is "doubtful" that the government will ever have sufficient evidence to bring to trial those responsible for Mr. Hoffa's disappearance.[3]

Plaintiff Dickerson's reply brief further advised the court that the Missouri proceedings had disclosed the existence of two categories of documents that might quickly reveal the status of the Hoffa investigation: documents containing the results of high level strategy conferences, with synopses of the investigation to date, and memoranda updating the Director of the FBI on the status of the investigation. The plaintiff's brief suggested that the court conduct an *in camera* review of all documents in these two categories. Since the Missouri court had already ordered the Justice Department to prepare a *Vaughn* index on the 68–volume file from FBI headquarters in Washington, plaintiff Dickerson suggested that the Department should be ordered to produce a copy of that index as well.

In the meantime, plaintiff Dickerson had served notice of the depositions of FBI Director Sessions and declarants Llewellyn, Moody and Baker, and the Justice Department had moved for a stay of discovery. The motion was referred to a magistrate judge, who conducted two telephone conferences on the matter.

In the course of the first conference the Justice Department indicated a willingness to go through the headquarters file and segre-

2. A *"Vaughn* index," which takes its name from a technique developed in *Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir.1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974), is a document-by-document index, specially prepared for litigation purposes, in which the agency describes the contents of its records and the reasons why each of the disputed items is claimed to be exempt from disclosure. See *Osborn v. Internal Revenue Service,* 754 F.2d 195, 196 (6th Cir. 1985), and the cases there cited, for a statement of the criteria such an index must meet. The requirement for a *Vaughn* index in Mrs. Crancer's case was subsequently upheld by a divided three judge panel of the Court of Appeals for the

Eighth Circuit, see *In re Department of Justice,* 950 F.2d 530 (8th Cir.1991), but the panel decision has been vacated in connection with the granting of a rehearing *en banc.* See Order at 950 F.2d 538. As of this writing the *en banc* court has not announced its decision.

3. The Justice Department later submitted an official transcript of the subcommittee hearing showing that Director Sessions had declined to comment on the likelihood of indictments being obtained, and that it was Oliver B. Revell, Executive Assistant Director–Investigations, and not Director Sessions, who made the "doubtful" comment.

gate, for *in camera* review by the court, all documents in the two categories singled out by the plaintiff. Government counsel later confirmed with declarant Moody, Chief of the FBI's Organized Crime Unit, that such documents had not yet been physically segregated. Mr. Moody disclosed to counsel, however, and counsel disclosed at the second telephone conference with the magistrate judge, that Moody already had a file of documents, culled from the field office records in Detroit, that contained an update on the Hoffa investigation. This file had recently been assembled on Mr. Moody's own initiative to prepare him to testify if he should be ordered to give his deposition. The Moody file had not been put together with the idea of turning it over to the court for *in camera* review, counsel explained, but the government offered to make it available to the court for that purpose, along with all documents in the two categories specified by the plaintiff.

The magistrate judge expressed an interest in keeping the scope of any *in camera* review manageable, and counsel for plaintiff Dickerson agreed that the district judge would be more likely to undertake such a review if the quantity of materials were not excessive. The telephone conference led to an order in which the magistrate judge directed that the Moody file be sent to Michigan for possible *in camera* inspection by District Judge La Plata. The plaintiff's request to depose the four FBI officials was deferred in the meantime.

Judge La Plata concluded that with the addition of Assistant Director Baker's declaration, the declarations alone might be sufficient. In view of the testimony before the Senate subcommittee, however, and in view of the length of time that had elapsed since Mr. Hoffa's disappearance, Judge La Plata elected to review the Moody file (consisting of some 335 pages) in its entirety.

Having completed a careful and thorough review of the Moody file *in camera*, the court expressed itself as "satisfied beyond any doubt" that the investigation was active, that it was continuing, and that it was directed toward the institution of criminal proceedings. Because the court likewise found that disclosure of the documents sought by plaintiff Dickerson and his newspaper could reasonably be expected to interfere with enforcement proceedings, the court entered summary judgment in favor of the Department of Justice. A subsequent motion for reconsideration was denied, and this appeal followed.

## II

■ Law enforcement records cannot "reasonably be expected to interfere with enforcement proceedings," it has been suggested, unless there is at least "a reasonable chance that an enforcement proceeding will occur...." *Nevas v. Dept. of Justice*, 789 F.Supp. 445, 448 (D.D.C.1992).[4] We agree, and we turn first to the procedure followed by the district court in preparing itself to determine the likelihood that enforcement proceedings might still occur in the Hoffa case. (The court's determination of the likelihood that disclosure of the requested documents might interfere with any such proceedings also has a procedural aspect, and we shall touch on this at the same time.)

■ Although requested to follow the lead of the district court in Missouri in ordering the compilation of a *Vaughn* index on the FBI headquarters file, Judge La Plata did not do so. Plaintiff Dickerson maintains that the court committed reversible error in granting the government's summary judgment motion without having had the benefit of such an index.

Depending on the nature of the case, the use of a *Vaughn* index may have obvious advantages from the perspective of one or another of the litigants or from the perspective of the courts. See, for example, *Ingle v.*

---

4. Even where exemption (7)(A) has become inapplicable, however, records compiled in the course of the investigation may still be exempt if production could be expected to constitute an unwarranted invasion of personal privacy or disclose the identity of a confidential source, or if production would disclose law enforcement techniques and procedures that could be expected to risk circumvention of the law in other cases. See 5 U.S.C. § 552(b)(7)(C), (D), and (E). In the case at bar the district court made no determination as to the applicability of these sections, and we shall confine our analysis to exemption (7)(A).

*Dept. of Justice,* 698 F.2d 259 (6th Cir.1983), where we indicated that a *Vaughn* index makes the playing field more nearly level for the party seeking disclosure, facilitates effective appellate review, and may obviate any need for the courts to review documents *in camera.* In the context of a case that did not involve exemption (7)(A), we have said that a *Vaughn* index should be obtained in "most" Freedom of Information Act cases. *Osborn v. Internal Revenue Service,* 754 F.2d 195, 197 (6th Cir.1985).

As we subsequently explained in a *Vaughn* decision of our own, however, *Osborn* created no hard and fast rule with respect to *Vaughn* indices as such. *Vaughn v. United States,* 936 F.2d 862, 867 (6th Cir.1991). The government must provide sufficient information in sufficient detail to enable the court "to make a reasoned, independent assessment of the claim of exemption," but no particular method of doing so is mandated; "[a] court's primary focus must be on the substance, rather than the form, of the information supplied by the government to justify withholding requested information." *Id.* The Supreme Court has consistently taken what it terms "a practical approach" to Freedom of Information Act matters, see *John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 157, 110 S.Ct. 471, 477, 107 L.Ed.2d 462 (1989), and this circuit tries to do the same.

Where exemption (7)(A) is concerned, as a practical matter, it is often feasible for the courts to make "generic determinations" about interference with enforcement proceedings. See *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 223–24, 98 S.Ct. 2311, 2317–18, 57 L.Ed.2d 159 (1978).[5] In many (7)(A) cases, at least, affidavits of the

sort presented by the government here would seem to provide an adequate basis for making such determinations.

█ The case at bar may be somewhat unusual in that here the district court was initially uncertain whether an actual enforcement proceeding was still being contemplated and whether the "purpose and point" of the investigation that generated the records in question had "expired." See *Robbins Tire,* 437 U.S. at 232, 98 S.Ct. at 2322, referring to legislative history indicating that "with the passage of time, ... when the investigation is all over and the purpose and point of it has expired, [disclosure] would no longer be an interference with enforcement proceedings and there ought to be disclosure." But insofar as the question to be resolved by the courts is whether actual enforcement proceedings are still being contemplated, it does not seem to us that valuable time should normally have to be spent on the preparation and analysis of a *Vaughn* index. As a practical matter, affidavits by people with direct knowledge of and responsibility for the investigation usually ought to suffice.

Here the district court believed that the government's affidavits might be sufficient standing alone to support a finding on whether the point and purpose of the investigation had expired, but the court nonetheless felt the need for a reality check of some kind. The Moody file seemed like a sensible place to start, and we think it was clearly within the court's discretion to begin there. If the Moody file had turned out not to be helpful, the court could obviously have moved on to an *in camera* inspection of the two groups of

---

5. The plaintiff in *Robbins Tire* was seeking disclosure of witness statements taken by the National Labor Relations Board. The plaintiff contended that such statements could be withheld under exemption (7)(A) only upon a showing of a particularized risk of interference with a particular enforcement proceeding. The Supreme Court rejected the contention that no "generic determinations" of likely interference could ever be made, concluding instead that "Congress did not intend to prevent the federal courts from determining that, with respect to particular kinds of enforcement proceedings, disclosure of particular kinds of investigatory records while a case is pending would generally 'interfere with enforce-

ment proceedings.'" *Robbins Tire,* 437 U.S. at 236, 98 S.Ct. at 2324.

When *Robbins Tire* was decided, exemption (7)(A) required a showing that disclosure "would" interfere with enforcement proceedings. Congress subsequently amended the statute by dropping the word "would" and replacing it with the current formula, which protects law enforcement records to the extent that disclosure *"could reasonably be expected* to interfere...." (Emphasis supplied.) See Pub.L. 99–570, § 1802(a) (1986). This statutory change strengthens the conclusion reached by the Supreme Court in *Robbins Tire,* of course.

documents that both parties had suggested the court might wish to examine. After reviewing all of the documents in the Moody file, however, the court concluded that there was no need to go further. We too have reviewed the Moody file in its entirety, and we see no abuse of discretion in the district court's decision on this score.

Plaintiff Dickerson argues that the decision to review only documents "hand-picked" by the government deprived him of the benefits of the adversary process. But the materials in the Moody file were selected, as we have seen, for briefing Mr. Moody on the status of the investigation, and not for submission to the court for review by it *in camera*. The idea of a court review of the Moody file in isolation originated with the magistrate judge, not with the government. The review process was necessarily non-adversarial, to be sure, but the process would have been equally non-adversarial if the documents under review had included the additional materials the government had said it was willing to turn over to the court.

The approach developed by the magistrate judge was designed in part to avoid a situation in which the district judge might have felt constrained to review more documents *in camera* than he would have wanted to see. This approach makes sense to us. The adversaries could, and did present arguments on the sufficiency of the affidavits that formed the government's main line of defense,[6] and review of *any* documents *in camera* might well have been deemed superfluous; we think it was reasonable for the magistrate judge to offer Judge La Plata the documents that had already been segregated, and we think it was reasonable for Judge La Plata to decide, after reviewing them, that he had seen all he needed to see in order to make a proper decision.

### III

### A

 The district court was correct, we believe, in its finding on the likelihood of a criminal prosecution being brought.

It is clear, as we read the record, that the Hoffa investigation remains active. In the judgment of Assistant Director Baker—the person whose responsibility it is to determine whether the investigation should still be pursued, and, if so, what FBI resources should be devoted to it—the investigation warrants the FBI's continued efforts to bring to trial those responsible for Mr. Hoffa's disappearance.

Mr. Baker has allocated continued FBI resources to the Hoffa investigation, according to his declaration, and the declaration says that the investigation "is ongoing and still absorbs FBI management and field agent resources on a regular basis." The documents in the Moody file are consistent with Mr. Baker's representation that the Hoffa investigation remains active.

The fact that the investigation is continuing does not mean that a prosecution will definitely be brought, of course, but the Baker declaration says that FBI criminal investigations often result in enforcement proceedings many years after the crimes were committed. "[W]ith the passage of time," Mr. Baker continues, "persons with knowledge of Mr. Hoffa's disappearance may feel more free to disclose critical information to law enforcement officers." Attesting to a "belief that the person(s) responsible for Mr. Hoffa's disappearance can be identified and prosecuted," Mr. Baker says that he "would not knowingly permit scarce FBI resources to be devoted to a futile investigation."

FBI retiree Walton and Executive Assistant Director Revell may consider it doubtful whether anyone will ever be brought to trial in the Hoffa case, and they may be right. Neither of them is responsible for deciding whether it is worthwhile to continue the investigation, however, and the official who does have that responsibility—Assistant Director Baker—obviously believes that there is still a reasonable prospect of a prosecution being brought. No court is likely to be able to match Mr. Baker's expertise on that kind

---

**6.** Plaintiff Dickerson complains about the failure of the district court to hear oral argument, but each side had ample opportunity to present its

case through briefs. In addition, of course, there were two telephone conferences with the magistrate judge.

of question, and, like the district court, we are disposed to defer to his judgment.

## B

The district court was also correct, we believe, in its finding that production of the records sought by plaintiff Dickerson could reasonably be expected to interfere with a future prosecution.

In some contexts, the Supreme Court has said, the most obvious risk of interference with enforcement proceedings is that witnesses will be coerced or intimidated into changing their testimony or not testifying at all. *Robbins Tire,* 437 U.S. at 239, 98 S.Ct. at 2325. The declarations of Messrs. Llewellyn and Moody both demonstrate that witness intimidation is a genuine concern in the Hoffa investigation—an investigation that the FBI has designated a "Racketeering Influenced and Corrupt Organization–La Cosa Nostra Labor Racketeering Investigation." If the perpetrators of the crime knew what investigative leads the FBI is pursuing, who the prime suspects are, and the nature of the evidence gathered to date, as one of the affidavits explains, they "could take steps to destroy or tamper with evidence, intimidate witnesses or construct a false alibi...."

In organized crime investigations such as this one, moreover, it has been the experience of declarant Moody, the chief of the Organized Crime Section of the FBI's Criminal Investigation Division, that informants can provide information critical to the successful conclusion of the investigation. Public disclosure of the Hoffa investigation files, Mr. Moody has declared, would discourage such individuals from coming forward.

Another important issue, particularly in homicide cases, has to do with the corroboration of evidence. Verification of statements given by future witnesses becomes harder, Mr. Moody has indicated, where the factual information developed in the investigation has entered the public domain.

In addition, the record before us shows that the Hoffa files contain information regarding other pending and prospective criminal proceedings. The prospect of interference with such enforcement proceedings is not without significance.

Although the government has the burden of showing that production of the records could reasonably be expected to interfere with enforcement proceedings, the mere fact that the burden of justifying non-disclosure rests with the government does not illuminate the question of how heavy the burden is. See *Robbins Tire,* 437 U.S. at 224, 98 S.Ct. at 2318. Having regard to the important public interest that exemption (7)(A) was designed to protect, having regard to the fact that the language of the exemption has been broadened by Congress to protect records that "could" be expected to interfere, as opposed to records that "would" interfere, and having regard to the obvious risks that public disclosure of these active investigation files would entail, we agree with the district court that the burden with respect to interference has been met in this case.

## IV

■ The Llewellyn declaration characterizes the documents in the Hoffa investigation files as follows:

"Documents setting forth leads to be conducted.

Documents containing information received from confidential informants.

Information and documents provided by local law enforcement.

Interviews of third parties and cooperating witnesses.

Public source information such as newspaper clippings and press releases.

Public and sealed court documents.

Laboratory reports setting forth results of examinations.

Polygraph worksheets and reports."

To the extent that public source information and public judicial materials are included in the files, the government has agreed to make the relevant documents available to plaintiff Dickerson. All that is in controversy here is the non-public portions of the files.

Plaintiff Dickerson candidly acknowledges, in a footnote toward the end of his principal brief, that it is open to the government to justify the assertion of a (7)(A) exemption on a "category-of-document" basis rather than

by proceeding document by document. He points out, however, that there is no blanket exemption for investigatory files as such, and he argues that we should at least remand the case with instructions that the government be required to segregate and produce all nonexempt material. In support of this suggestion he quotes the last sentence of 5 U.S.C. § 552(b), which says that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."

It is doubtless true that by deleting large portions of the information contained in the Hoffa files, the government could render whatever was left useless to any law-breaker. (And useless to plaintiff Dickerson and his newspaper, we might add.) But the words "reasonably segregable" must be given a reasonable interpretation, particularly where information or records compiled for law enforcement purposes are concerned. On the record before us we do not believe that the prospects for finding any "reasonably segregable" non-public portions of the Hoffa files that could properly be made public are such as to justify the remand that plaintiff Dickerson seeks.

The judgment of the district court is **AF-FIRMED.**

BECKWITH, District Judge, concurring.

### I.

I concur with Judge Nelson's results and his reasoning. I write separately, because I am convinced that more compelling grounds exist for exempting the Department of Justice's Hoffa file than that which was the basis of the district court's decision.

In the Llewellyn declaration, the Department of Justice cited at least three exemptions from the Freedom of Information Act in addition to exemption 7(A) of 5 U.S.C. § 522(b). The first such exemption is 7(C), the exemption for information, the disclosure of which "could reasonably be expected to be an unwanted invasion of personal privacy." The second is exemption 7(D) for information that "could reasonably be expected to disclose the identity of a confidential source."

The third such exemption is 7(E), the exemption for information that "would disclose techniques and procedures for law enforcement investigations or prosecutions ... [when] such disclosure could reasonably be expected to risk circumvention of the law."

Apparently, the trial court considered each of the cited exemptions. Nevertheless, that court rested its decision entirely on exemption 7(A), concluding that the Department of Justice was engaged in an ongoing investigation directed toward the potential institution of criminal proceedings. Judge Nelson has properly confined his analysis to a review of the trial court's decision based upon exemption 7(A). I agree that the contents of the Moody file sufficiently support the trial court's conclusion that the contents of the Hoffa file are exempt under 7(A). The question is a close one, however, as is illustrated by the dissent.

My review of the Moody file suggests that each of the four exemptions discussed above supports the nondisclosure of some or all of the documents in the Hoffa file. Had the district court based its decision on all four exemptions, the correctness of the decision would have been beyond question and our review would have been much simpler.

### II.

My review of the Moody file further suggests that the various exemptions are so intertwined, overlapping, and inextricable that virtually nothing from the Hoffa file could be revealed without jeopardizing the integrity of the investigation, confidential source identity, various individuals' privacy, and law enforcement investigative techniques. For this reason, the trial court could not have ordered a *Vaughn* index without risking inadvertent release of exempt and sensitive information.

There being no constitutional outline for the manner in which a trial court must approach its analysis of a government claim of exemption from the Freedom of Information Act, it cannot be said that the trial court in this instance failed to independently, adequately, and objectively assess the validity of the government's claim. The trial court was

under no obligation to follow Plaintiff's proffered procedure when another effective option was available. For that reason, I cannot agree with the dissent's criticism of the trial court's failure to order the production of an index.

BATCHELDER, Circuit Judge, dissenting.

## I.

Over the past seventeen years, the Department of Justice has compiled a file of nearly four hundred volumes of documents on the disappearance of Jimmy Hoffa, a man, and a mystery, surely needing no introduction. Appellant Brian Dickerson, who happens to be editor of a major Detroit newspaper, has exercised the privilege Congress has given the public to request access to the documents in this file. While granting this privilege, Congress has also recognized that good government, in some circumstances, requires secrecy. Nonetheless, it has placed the burden of showing the need for secrecy on government agencies wishing to protect certain documents from public scrutiny. Since I believe the Government has fallen woefully short in carrying its burden, I dissent.

## II.

The Freedom of Information Act ("FOIA" or "the Act"), 5 U.S.C. § 552, enables citizens regardless of status to gain access to government documents, thus " 'open[ing] agency action to the light of public scrutiny.' " *Vaughn v. United States,* 936 F.2d 862, 865 (6th Cir.1991) (quoting *Department of Justice v. Reporters Committee for Freedom of Press,* 489 U.S. 749, 772, 109 S.Ct. 1468, 1481, 103 L.Ed.2d 774 (1989)); *see also John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 151, 110 S.Ct. 471, 475, 107 L.Ed.2d 462 (1989) (" '[The Act] seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands.' " (quoting *EPA v. Mink,* 410 U.S. 73, 80, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973)). The Act's purpose is " 'to ensure an informed citizenry, vital to the functioning of a demo-

cratic society, needed to check against corruption and to hold the governors accountable to the governed.' " *John Doe Corp.,* 493 U.S. at 152, 110 S.Ct. at 475 (quoting *NLRB v. Robbins Tire & Rubber Co.,* 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978)). It requires " 'full agency disclosure unless information is exempted under clearly delineated statutory language.' " *Vaughn,* 936 F.2d at 865 (quoting *Department of the Air Force v. Rose,* 425 U.S. 352, 360–61, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976)). The exemptions are to be "narrowly construed." *Id.* " '[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.' " *John Doe Corp.,* 493 U.S. at 152, 110 S.Ct. at 475 (quoting *Rose,* 425 U.S. at 361, 96 S.Ct. at 1599). To avoid releasing requested documents, the Government must prove that the documents sought fit a specific statutory exemption; the person making the request bears no burden of showing that such documents may not be withheld. *Vaughn,* 936 F.2d at 866 (citing *Department of Justice v. Tax Analysts,* 492 U.S. 136, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989)).

A. *Existence of an ongoing law enforcement proceeding.*

In reviewing a District Court's decision under the FOIA, the Court of Appeals must "determine first whether the District Court had an adequate factual basis for its decision, and second, decide whether upon that basis the court's decision was clearly erroneous." *Vaughn,* 936 F.2d at 866 (citing *Ingle v. Department of Justice,* 698 F.2d 259, 267 (6th Cir.1983)). I agree with the majority that the record shows that the FBI has continued to pursue the Hoffa disappearance investigation and that officials believe that eventual prosecution is not out of the question. William M. Baker, the Assistant Director of the FBI in charge of the Criminal Investigative Division, who apparently has the authority to decide whether to continue the investigation, made a sworn declaration to that effect, and that is good enough to establish the existence of "a concrete prospective law enforcement proceeding."

B. *Interference with an ongoing law enforcement proceeding.*

While the existence of such an ongoing proceeding is necessary to a finding of exemption under § 522(b)(7)(A), *Bevis v. Department of State,* 801 F.2d 1386, 1389 (D.C.Cir.1986),[1] showing that such a proceeding indeed exists does not serve to exempt the entire file on the proceeding. *Id.* The Government also must prove that the documents, if released, could interfere with enforcement proceedings. Here, the Government essentially did nothing more than assure the reviewing court that all 400 volumes on Hoffa relate to their enforcement efforts, and recite (using language remarkably similar to statutory and case language) the harms that will result from any disclosure save for press clippings. It has not met its further burden of proof.

FOIA cases seem to pit citizen suspicion against government defensiveness. The fact that one side knows the entire truth and the other must guess at it (as, indeed, must the judge) requires adherence to procedures meant to inform the court as to the nature of government documents without revealing their actual contents, and to retain as much fairness in the adversary proceeding as possible given the imbalance of information. *See Wiener v. FBI,* 943 F.2d 972, 977 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3013, 120 L.Ed.2d 886 (1992) (quoting *Vaughn v. Rosen,* 484 F.2d 820, 824 (D.C.Cir. 1973), *cert. denied,* 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974) (" 'This lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system.' ").

The majority places great emphasis on the "public interest that exemption 7(A) was designed to protect" and the "obvious risks that

public disclosure of these ... files would entail." I do not quarrel with the majority's observation that the release of documents containing, for example, the names of witnesses and informants might well lead to witness intimidation and destruction of evidence by those implicated in an ongoing investigation. Indeed, in enforcement exemption cases, "the interests of the adversary process may be outweighed by the agency's legitimate interest in secrecy." *Campbell v. Department of Health & Human Services,* 682 F.2d 256 (D.C.Cir.1982).

However, I believe the majority understates the Government's burden of showing that specific documents in its possession contain sensitive information. The majority admits that "the mere fact that the burden of justifying nondisclosure rests with the government does not illuminate the question of how heavy the burden is," and notes that Congress "broadened" exemption 7(A) from covering only records which "would" be expected to interfere with enforcement proceedings to those records which "could" be expected to interfere. While I recognize that Congress loosened up the standard somewhat from the seemingly unprovable "would interfere" standard to the more reasonable "could interfere," I certainly do not believe that in amending the statute Congress changed the underlying premise of the Act, that " 'disclosure, not secrecy, is the dominant objective of the Act.' " *John Doe Corp.,* 493 U.S. at 152, 110 S.Ct. at 475 (quoting *Rose,* 425 U.S. at 361, 96 S.Ct. at 1599). Permitting the Government to satisfy its burden by simply assuring the court that all of the requested papers in a giant, seventeen year old file relate in some way to an ongoing investigation, as I think happened here, potentially robs the Act of all effectiveness in attaining this objective.

---

**1.** To restate, § 522(b)(7)(A) exempts "investigatory records compiled for law enforcement purposes ... to the extent that the production of such law enforcement records or information ... could reasonably be expected to interfere with enforcement proceedings." The earlier version of this provision exempted such records where production "would" interfere with enforcement. *See North v. Walsh,* 881 F.2d 1088, 1098 n. 14 (D.C.Cir.1989) ("This change 'relieves the agency of the burden of proving to a certainty' that disclosure will interfere with enforcement pro-

ceedings, 'but does not otherwise alter the test.' ") (quoting *Reporters Committee for Freedom of the Press v. Department of Justice,* 816 F.2d 730 (D.C.Cir.), *modified on reh'g,* 831 F.2d 1124 (1987), *rev'd on other grounds,* 489 U.S. 749, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989)). The Congress has lessened the Government's burden, but the causal connection between specific documents and potential interference still must be established; the statute still does not permit "blanket assertions" such as the Government has made here.

This Circuit has recognized that the focus of a FOIA case is the contents of the documents requested, not the purpose for which the Government possesses them. The Act grants disclosure exemptions for documents containing information which would most likely harm an ongoing investigation in a specific way if made public. Thus,

> a court must have sufficiently detailed information regarding the contents of withheld documents along with reasoning for the application of specific FOIA exemptions to enable the court to make an independent assessment of both the contents of the documents in issue and the applicability of any asserted exemptions.

*Vaughn*, 936 F.2d at 869. The court may not grant " 'blanket exemptions' for Government records simply because they were found in investigatory files compiled for law enforcement purposes." *Robbins Tire & Rubber Co.*, 437 U.S. at 236, 98 S.Ct. at 2324. The Government "must demonstrate *specifically* how each document or category of documents, if disclosed, would interfere with the investigation." *Campbell*, 682 F.2d at 265 (emphasis added). The trial court has considerable discretion as to what procedures it uses to decide whether certain documents are exempt from disclosure, but whatever procedure the court chooses must suffice to produce enough evidence on which to rule, and to produce a record an appeals court can consult to review the decision. *Vaughn*, 936 F.2d at 869.

Reading the majority opinion may leave one with the distinct impression that we really have no idea what information lurks in the massive Hoffa file. That impression would be correct. The record presented us does not allow this court to make the requisite independent assessment of whether each document or category of documents would interfere with the Government's enforcement efforts. Obviously, the Government need not produce each and every document for the judge to decide whether its contents merit exemption from release. The Government's submissions may describe the documents by categorizing them according to their content and nature, *Bevis v. Department of State*, 801 F.2d 1386, 1389 (D.C.Cir.1986); the indexing and categorizing of documents, partic-

ularly where the requested documents are voluminous, is preferred to in chambers inspections, *Vaughn*, 936 F.2d at 866. While courts have smiled on the use of *Vaughn* indices in sorting out large volumes of documents, and in their discretion sometimes ordered such indices produced, so long as the Government provides sufficiently specific and detailed information to permit the court to make a reasoned determination, "no particular method ... is mandated." *Id.* at 867.

Just because the Act does not mandate a particular method does not mean that any method will do. The Llewellyn declaration, which the majority believes adequately provides a categorization of the documents in the file, falls short in two respects. First, categories such as "information and documents provided by local law enforcement" and "public and sealed court documents" are not "sufficiently distinct to allow a court to determine, as to each category, whether the specific claimed exemption(s) are properly applied." *Vaughn*, 936 F.2d at 868. The court must be able " 'to trace a rational link between the nature of the document and the alleged likely interference.' " *Bevis*, 801 F.2d at 1389 (quoting *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 789 F.2d 64, 67 (D.C.Cir.1986)).

Second, even though a few of Mr. Llewellyn's categories, such as "documents containing information from confidential informants," more appropriately describe materials that fit the exemption, I do not believe the Government's task ends there with respect to showing that the documents it seeks to keep secret fit in those clearly exempt categories. A category alone gives no clue as to the content of the documents it purportedly encompasses; therefore it does not provide "adequate detail and justification" to satisfy the claimed exemption. *Id.* at 869. While our decision in *Vaughn* is careful not to prescribe specific methods, I think our opinion in that case, which affirmed the exemptions claimed there, describes considerably more effort on the part of the affiant than we see here. The affiant in *Vaughn* did assign the documents to rather general categories, but she

also indicated, by page number, which of the 1,000+ documents were included in each of the categories. For each of the categories, [the affiant] then discusses the legal grounds and exemptions upon which the government relies in withholding *the specific documents contained within each category.* Attached to her affidavit is an exhibit which summarizes, by document page number, the exemption(s) relied on for withholding *each of the 1,000+ pages.* *Vaughn,* 936 F.2d at 868 (emphasis added). This passage, it seems to me, illustrates the rule that the Government must demonstrate that the contents of identifiable documents actually fit the exemption claimed. The record here does not allow us to see how this fit has been made. For example, while the Government has told us that the Hoffa file contains informant interviews, which comes as no surprise, it has not explained even in broad terms which specific documents those are, how many there are, or anything else to prove that the Government is not making a blanket representation, but has reviewed those documents and has good reason to believe that releasing *any* of them could harm the ongoing investigation.[2] *See Bevis,* 801 F.2d at 1389 ("[T]he FBI must itself review each document to determine the category in which it properly belongs. Absent such individual scrutiny, the categories would be no more than smaller versions of the 'blanket exemptions' disapproved by Congress in its 1974 amendment of FOIA.").

Our decision in *Vaughn,* following fairly straightforward Supreme Court precedent, requires that the Government make a choice in arguing for exemption from FOIA disclosure. It may present the court with a highly detailed *Vaughn* index, it may create more general exempt categories and then show how each document fits into them, or it may haul the entire file into chambers for hands-on review by the judge; the last of these, as I have explained, we have strongly discouraged. By holding in this case that the Gov-

ernment has met its burden of showing the entire Hoffa file to be exempt under § 522(b)(7)(A), the majority leaves FOIA law in this Circuit with the worst of all worlds. The Government has defined several general categories of documents, not all of them properly exempt, and then handed the court an admittedly nonrepresentative packet of secret documents to inspect in chambers. Neither effort sufficed to show how each and every document in the Hoffa file fits the proffered statutory exemption; the two methods taken together do not add up to a proper or sufficient showing. I am at a loss to reconcile the majority's opinion either with our *Vaughn* decision or with the Supreme Court's teachings on FOIA law.

### C. *Segregability of portions of the file.*

I also disagree with the majority's conclusion that the Government has adequately shown that none of the Hoffa file, save for "public" documents such as newspaper clippings, is "reasonably segregable" under § 522(b). This provision requires the Government to release "any materials that do not properly fall within a legitimately withheld category." *Bevis,* 801 F.2d at 1390. Since I do not think the Government adequately showed what the Hoffa file contains, I certainly do not think it adequately demonstrated that none of this immense file falls outside of the statutory exemptions, as the statute itself requires. The Act does not ask the Government to judge the "prospects" of segregating non-exempt material, it commands the Government to segregate its files if at all possible. Both the statute and the caselaw indicate that Congress was largely unconcerned with the administrative burdens it was imposing on government agencies, but placed a higher value on openness. It is not our place to reorder Congress's priorities. Neither, might I add, is it our place to judge whether the material a citizen requests from the Government is "useless."

---

**2.** A word on the "Moody file." Our decision in *Vaughn* makes it clear that *in camera* review of documents is not favored, particularly where the Government chooses to proceed using categories of documents, rather than presenting all the documents it seeks to exempt to the reviewing court. *See Vaughn,* 936 F.2d at 868–69. The Govern-

ment admits that the documents in this file were compiled to help Agent Moody prepare his affidavit, and does not suggest that the documents somehow represent others in the Hoffa file. Allowing us to peek at a few documents from the Hoffa file does nothing to prove that the rest of the file is exempt.

## III.

It is difficult to ignore the fact that the documents Mr. Dickerson has requested may contain the secrets to Jimmy Hoffa's disappearance. One may be predisposed in favor of government secrecy or against, or may approve or disapprove of investigative reporting by the media. However, in enacting FOIA, Congress has chosen to value government disclosure over government convenience and economy, and chosen not to favor or disfavor certain persons or their reasons for asking the Government to disclose documents. Here, a private citizen has made a specific request. Congress has placed a heavy burden on the government agency wishing to keep the requested documents secret, and that burden has not been met. While it may well be that the Hoffa file should remain a secret, I do not believe that the Government has yet proven why. I dissent.